*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

DANIEL ROBERT BOWSER II,

      Defendant-Appellant.

UNPUBLISHED
September 19, 2024

No. 366291
Saginaw Circuit Court
LC No. 21-048372-FC

Before: PATEL, P.J., and YATES and SHAPIRO,* JJ.

PER CURIAM.

Defendant, Daniel Robert Bowser II, appeals as of right his jury-trial convictions of first-degree premeditated murder, MCL 750.316(1)(a), and assault with intent to commit murder (AWIM), MCL 750.83. He was sentenced to life imprisonment without the possibility of parole for the first-degree murder conviction and 135 to 300 months' imprisonment for the AWIM conviction. On appeal, defendant contends that the district court abused its discretion by denying his motion for a corporeal lineup before the scheduled preliminary examination. We affirm.

## I. FACTUAL BACKGROUND

According to the prosecution's evidence presented at trial, sometime between 11:30 p.m. and midnight on November 10, 2020, defendant, who was apparently intoxicated, arrived uninvited at the home of Adolpho Juarez. Defendant was driving a truck and seeking drugs. Defendant tried to walk into Juarez's home, but Juarez pushed him away, and defendant ended up leaving the property. Soon after defendant left Juarez's home, Juarez received a call from his

_____

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

friend and neighbor Cody Lanagan, who told him that someone had just run over his father, Doug Lanagan.[1]

Cody lived four houses down the road from Juarez with Doug, his mother—Catherine, and a friend—Paul Blake. At approximately midnight, Catherine and Blake were watching a movie and Cody and Doug were asleep when a pickup truck pulled into their driveway. The truck's driver started repeatedly honking his horn. Catherine stepped onto the front porch, and the driver of the truck identified himself as "Dan" and asked for Cody. Refusing to leave when informed that Cody was asleep, the driver continued honking and yelling for Cody. Doug then ran outside and told Catherine that he would "take care of it." The truck initially backed out of the driveway, and Doug followed the truck into the street. But then the driver drove the truck back toward the house and onto the curb. At about this time, Blake woke Cody up and told him that someone was "messing with" his father.

As Cody walked out of the house and into the front yard, the truck backed out into the street, and Doug walked into the driveway. The truck then sped forward, striking Doug with the middle of the truck's front bumper and causing Doug's head to land hard on the pavement. Cody ran at the truck while the truck moved back into the street. Cody briefly checked on his father before running back to the edge of the road, yelling at the driver to leave. Cody then began heading back in the direction of his father before turning toward the truck again. The driver pulled the truck back into the yard and drove directly at Cody, who dodged the truck. The truck then pulled out of the driveway and finally drove away. Doug passed away five days later as a result of his injuries.

In the initial aftermath of the homicide and assault, Cody, despite having a good view of the driver, was only able to provide a physical description to investigators. Cody testified that his "mind was all over the place" when he first provided a statement to the police. But when his "brains finally calmed down from everything" and after speaking with friends, including Juarez, Cody identified defendant as the driver. Specifically, Juarez had gone to Cody's home to offer condolences when the two men spoke. When Juarez learned that the driver had identified himself as "Dan," he relayed to Cody what had happened at his home just prior to the incident at Cody's house. Together, they looked up Facebook photos and determined that the driver was defendant, whom they had previously met. Although the testimony differed regarding how long Cody and Juarez had known defendant, they agreed that they had initially met defendant at a local bar where they drank and used cocaine together. Cody and Juarez also both testified that defendant had previously been to both of their homes in the past. Cody subsequently identified the driver as defendant and provided the Facebook photographs to law enforcement.

From Cody's identification and witness descriptions of the truck, law enforcement identified a green 2000 Ford F-150 belonging to defendant's father as the suspect vehicle. When it was finally located by authorities about two years later in November 2022, it had a large crack in the middle of the front bumper.

---

[1] Because several witnesses share the Lanagan surname, we will refer to them by their first names for purposes of this opinion.

Defendant was charged with one count of open murder, MCL 750.316, and one count of AWIM. Defendant filed a series of motions before his preliminary examination. Relevant here, defendant moved for a corporeal lineup before any witness identification of defendant was made at the preliminary examination. Defendant argued that because discovery indicated that no witness was able to identify defendant in their initial statements to police, any first-time identification at the preliminary examination would be unduly suggestive. The prosecution contended that a lineup was unnecessary because there was not a reasonable likelihood of a mistaken identification that could be resolved by a lineup.

The district court observed that it had reviewed the caselaw cited by defendant and that it was

> not aware of any obligation that the Court has to order a lineup, corporeal or photographic, just because the Defendant is in custody. If the Defendant is in custody . . . and has a lineup, he's entitled to counsel . . . . But I don't think it goes to the extent that because he happens to be in custody that it's obligated that he be given a lineup.

The district court found that the defense had not met its burden to justify a lineup and denied defendant's motion.

## II. ANALYSIS

We conclude that the district court did not abuse its discretion or violate defendant's due-process rights by denying his motion for a corporeal lineup prior to his preliminary examination.[2]

---

[2] "The decision to grant the defendant's motion for a lineup lies within the trial court's discretion." *People v McAllister*, 241 Mich App 466, 471; 616 NW2d 203 (2000), rev'd in part on other grounds 465 Mich 884 (2001). A trial court abuses its discretion when its decision "falls outside the range of principled outcomes." *People v Duncan*, 494 Mich 713, 723; 835 NW2d 399 (2013). "A trial court necessarily abuses its discretion when it makes an error of law." *People v Franklin*, 500 Mich 92, 100; 894 NW2d 561 (2017) (quotation marks and citation omitted). Questions of law, such as constitutional issues, are reviewed de novo. *People v Butler*, 513 Mich 24, 29; 6 NW3d 54 (2024). To the extent that the trial court made underlying factual findings, they are reviewed by this Court for clear error. *People v Brown*, 339 Mich App 411, 419; 984 NW2d 486 (2021). "Clear error is present when the reviewing court is left with a definite and firm conviction that an error occurred." *People v McChester*, 310 Mich App 354, 358; 873 NW2d 646 (2015) (quotation marks and citation omitted). Preserved constitutional errors are reviewed "to determine whether the beneficiary of the error has established that the error was harmless beyond a reasonable doubt." *People v Sammons*, 505 Mich 31, 56; 949 NW2d 36 (2020).

"A right to a lineup arises when eyewitness identification has been shown to be a material issue and when there is a reasonable likelihood of mistaken identification that a lineup would tend to resolve." *People v McAllister*, 241 Mich App 466, 471; 616 NW2d 203 (2000), rev'd in part on other grounds 465 Mich 884 (2001).

In this case, defendant challenges the district court's denial of his motion for a lineup, wherein defendant contended that his identification at the preliminary examination without a lineup beforehand would be unduly suggestive. We conclude that defendant did demonstrate that identification was a material issue given that the eyewitnesses did not identify the driver in statements to authorities immediately after the incident. But we further hold that the district court did not clearly err when it found that there was not a reasonable likelihood of a mistaken identification.

Defendant argues that there was a reasonable likelihood of a mistaken identification in this case because Cody's identification of defendant as the driver of the truck was questionable where he and Cody had a previous social relationship but Cody did not recognize defendant until prompted by friends. Defendant maintains that a lineup would have eliminated any concern about the reliability of Cody's identification of defendant. Entitlement to a lineup, however, is not a matter of whether the lineup would improve the reliability of an identification, but whether there was a reasonable likelihood of mistaken identification.

We are not firmly and definitely convinced that the district court erred by finding that there was not a reasonable likelihood of mistaken identification. Defendant points to the facts that the night of the incident was dark and rainy, that witnesses testified inconsistently regarding how long Cody and Juarez had known defendant or spent time with him, and that Cody did not immediately recognize defendant as the driver during the incident despite having a "good look" at his face and hearing his name. But, as the prosecution notes, Cody had just seen his father suffer a mortal injury. It is understandable that he only placed the face that he saw with defendant's name after discussing the incident with Juarez, who had been visited by defendant shortly before the assaults. Importantly, Cody had previously known defendant socially, and he consistently identified defendant as the driver at every stage of the proceedings. Additionally, Cody supplied defendant's name and a photograph of defendant to law enforcement, instead of the other way around, nearly eliminating the risk that any subsequent in-court identification of defendant would be unduly suggestive. Moreover, given that Cody had already identified defendant by name and knew him from prior meetings, there was little if any likelihood that he would fail to identify him in a lineup. See *McAllister*, 241 Mich App at 471. Also, Juarez identified defendant as the person driving a truck who stopped at Juarez's home and tried to walk into his house, which occurred shortly before the assaults took place at Cody's home a mere four houses away, strongly suggesting defendant's involvement in the offenses. And finally, the assailant indicated to Catherine that his name was "Dan."

Furthermore, the prosecution established an independent basis for the identification at trial. Juarez testified that during the 30 minutes preceding the murder, defendant had stopped at his nearby home driving a truck. Next, investigators seized a pickup truck belonging to defendant's father that matched the description of the truck involved in the incident and that had a crack in the front bumper—the same area of the truck that struck Doug. Testimony established that defendant and his father could not be mistaken for each other. Any possible error in the district court's denial

-4-

of the motion for a corporeal lineup was harmless beyond a reasonable doubt.  See *Sammons*, 505 Mich at 56.

Affirmed.

/s/ Sima G. Patel
/s/ Christopher P. Yates
/s/ Douglas B. Shapiro